T.C. Memo. 2011-237

UNITED STATES TAX COURT

KHATCHATOUR AKOPIAN AND RUZANNA TERFANYAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 31191-08.              Filed October 3, 2011.


        R determined that Ps had unreported income which
caused deficiencies in Federal income taxes and that Ps
are liable for accuracy-related penalties pursuant to
sec. 6662(a), I.R.C., for their 2005 and 2006 tax
years.

        <u>Held</u>:  Ps had unreported income and are liable for the
deficiencies in Federal income taxes and the penalties.

        <u>Held</u>, <u>further</u>:  P-W is not entitled to relief from
joint and several liability for the deficiencies pursuant to
sec. 6015, I.R.C.


<u>Akop Baltayan</u>, for petitioner Khatchatour Akopian.

<u>Kathryn I. Phillips</u>, for petitioner Ruzanna Terfanyan.

<u>Kris H. An</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of petitioners' liabilities for income taxes and accuracy-related penalties for the 2005 and 2006 tax years. After concessions by respondent on brief regarding unreported dividend income, the issues for decision are:

(1) Whether petitioners received unreported income of $1,219,969.48 and $464,843.97 for the 2005 and 2006 tax years, respectively;

(2) whether petitioners are liable for the section 6662(a)[1] accuracy-related penalties for the 2005 and 2006 tax years; and

(3) whether petitioner Ruzanna Terfanyan is entitled to relief from joint and several liability for taxes under section 6015(b) or (f) for the 2005 and 2006 tax years.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts and the accompanying exhibits are hereby incorporated by this reference.  At the time they filed their petition, petitioners resided in California.

Petitioners Ruzanna Terfanyan (Ms. Terfanyan) and Khatchatour Akopian (Mr. Akopian) are currently married and

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended and in effect for the tax years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

reside together. They were married in 2000. When they decided to marry, they purchased a condominium (condo) to serve as their home. Ms. Terfanyan believed that in 2005 Mr. Akopian took out a line of credit on the condo of $100,000, using $50,000 for business needs.

During the years at issue Ms. Terfanyan coowned and operated Ruz Meg Legal Services.[2] The company provided services relating to tax preparation, public notarization, immigration, and corporations. Ms. Terfanyan personally provided the notary public and individual tax return services.

Ms. Terfanyan prepared petitioners' tax returns for the 2005 and 2006 tax years. She determined her husband's income by asking him "at the end of the year" if he was making any money, to which he responded in the negative. Ms. Terfanyan never saw any documentation with regard to Mr. Akopian's earnings.

Sometime in 2004 a longtime acquaintance, Vardan Gevorgian (Mr. Gevorgian), approached Mr. Akopian with information about investing in an Armenian movie production company in Yerevan, Armenia. To make the investment and find other investors, Mr. Akopian organized Media Fox Enterprises, Inc. (Media Fox), a Nevada corporation, on December 1, 2004. Mr. Akopian was president, secretary, and treasurer of Media Fox. Mr. Akopian

---

[2]At trial Ms. Terfanyan's counsel referred to Ms. Terfanyan's former business as "Lux Med"; however, on brief the parties refer to Ms. Terfanyan's former business as Ruz Meg.

had the only signature authority over Media Fox's bank account during 2005.

Because Mr. Akopian had never produced a movie or made this type of investment before, Mr. Gevorgian was supposed to act as the middle person between Media Fox and the Armenian company. Mr. Gevorgian provided consulting services and did "all the paperwork what [sic] has to be done to do the movie production".

On October 4, 2005, Media Fox was dissolved into Global Glen Group, Inc. (Global Glen), which had been organized on August 25, 2005, as a Nevada corporation, to invest in the movies and advertising business. Mr. Akopian began Global Glen with his friend of 20 years, Grigor Bagdasarian (Mr. Bagdasarian). Mr. Bagdasarian took the helm as president of Global Glen and Mr. Akopian handled the finances as treasurer. Mr. Akopian had the sole signature authority over the Global Glen bank account during 2005 and 2006. Mr. Akopian and Mr. Bagdasarian agreed orally to share the profits of Global Glen equally. No formal (or written) agreements were ever made between Mr. Akopian and Mr. Bagdasarian. Apparently, Mr. Gevorgian would advise Global Glen on how much and when money should be sent.

Mr. Akopian used some of Media Fox's and Global Glen's money to pay personal expenses. The table below (table 1) shows the banking activities of Media Fox and Global Glen but excludes checks written from the accounts. It shows the total amounts of

customer withdrawals, ATM card purchases and withdrawals, payments made to BMW Financial Services for car loan or lease payments, and amounts of wired funds.[3]

| Corporation | Withdrawals | ATM Card Use | BMW Payments | Wired Amounts |
|---|---|---|---|---|
| Media Fox 2005 | $742,297 | $8,271 | $4,932 | $500,000 |
| Global Glen 2005 | 38,000 | --- | --- | --- |
| Global Glen 2006 | 125,743 | 9,213 | --- | 715,000 |
| Total | 906,040 | 17,484 | 4,932 | 1,215,000 |

In addition to the above banking activities of Media Fox and Global Glen, Mr. Akopian wrote corporate checks to Ms. Terfanyan and for other personal expenses. The table below (table 2) shows the total amounts of the checks written from Media Fox and Global Glen to: Mr. Akopian, cash, Ms. Terfanyan, CitiMortgage, Ruz Meg, Audi Financial Services, Wonder Year Child Care, home owners association (HOA) fees, and travelers insurance payments.[4]

---

[3]All numbers have been rounded to the nearest whole number.

[4]In addition to the amounts listed in table 2, in 2006, for example, Mr. Akopian wrote Global Glen checks to: LA County Tax totaling $1,051, Wells Fargo totaling $3,025, IKEA totaling $859, Water & Power Comm Credit Union totaling $2,032, DMV for $211, and other seemingly personal expenses including passport services and clothing stores, totaling $827. All of the these amounts are included when we refer to petitioners' personal expenses.

|  | Mr. Akopian | Cash | Ms. Terfanyan | Citi Mort. | Ruz Meg | Audi | Wond. Year Child | HOA | Trav- el- ers |
|---|---|---|---|---|---|---|---|---|---|
| Media Fox 2005 | $124,080 | $254,428 | $16,850 | $4,052 | $1,500 | $455 | $425 | $1,120 | $162 |
| Global Glen 2005 | 18,400 | 5,000 | 100 | 805 | --- | --- | --- | 237 | 162 |
| Global Glen 2006 | 267,760 | --- | 37,515 | 6,443 | 2,600 | 3,186 | 3,850 | 1,893 | 1,728 |
| Total | 410,240 | 259,428 | 54,465 | 11,300 | 4,100 | 3,641 | 4,275 | 3,250 | 2,052 |

In October of 2005 Mr. Bagdasarian went to Yerevan to confirm that the movie was actually being made. Mr. Bagdasarian was satisfied that the money being sent to the Armenian company was apparently for the most part used appropriately.

Things suddenly went bad when Mr. Gevorgian disappeared. Mr. Bagdasarian made a second trip to Yerevan in search of Mr. Gevorgian and the president of the Armenian company. He was unable to find either man; and after he inquired about the president of the movie company, his car was hit and three men assaulted him, inflicting grievous bodily injury.[5]

While respondent's revenue agent was examining canceled checks in an unrelated audit, he noticed that some checks were written to Global Glen and Media Fox. The revenue agent then determined that Global Glen and Media Fox had not filed corporate

---

[5]Mr. Bagdasarian made a third trip to Yerevan in February and March of 2009 when he heard from a singer that Mr. Gevorgian might be there. He was again unable to find him or the president of the movie company, Armen Shumanian.

tax returns and, through the Web site of the secretary of state for Nevada, ascertained that Mr. Akopian was the president of Media Fox and the treasurer of Global Glen.

Respondent requested all of the books and records for the corporations.  After petitioners failed to comply with his request, respondent summoned the corporations' bank for relevant documents.  From those documents respondent determined that petitioners had unreported income, on the basis of money withdrawn from the accounts by Mr. Akopian, checks written from the corporation to Mr. Akopian and Ms. Terfanyan personally and made out to cash, and the use of corporate funds to pay petitioners' personal expenses.

In the notice of deficiency, issued on September 30, 2008, respondent determined that petitioners had unreported qualified dividends of $1,944,301.50 and $1,237,006.64 in 2005 and 2006, respectively.[6]  He also determined income tax deficiencies of

---

[6]The notice of deficiency also disallowed certain itemized deductions and exemptions.  Petitioners did not contest respondent's adjustments of $10,075 and $13,037 to itemized deductions for 2005 and 2006, respectively.  They also did not contest his $12,800 and $13,200 adjustments to exemptions for 2005 and 2006, respectively.  Therefore, except as they are the result of any correlative computational adjustments which require adjustment as the result of this opinion, we deem those statutory notice of deficiency adjustments conceded.  See Levin v. Commissioner, 87 T.C. 698, 722-723 (1986) (citing Rule 142(a) for the proposition that because "petitioners have made no argument with respect to * * * deductions claimed * * * [, they] are deemed to have conceded their nondeductibility"), affd. 832 F.2d 403 (7th Cir. 1987).

$294,068 and $183,080 for the 2005 and 2006 tax years, respectively, and section 6662(a) penalties of $58,813.60 and $36,616 for the 2005 and 2006 tax years, respectively. Petitioners filed a timely petition with this Court on December 29, 2008, denying that they owed the deficiencies and claiming innocent spouse status for Ms. Terfanyan.

Despite repeated requests from respondent, petitioners never provided ownership or holding period information to entitle them to the lower tax rates afforded for qualified dividends. Therefore respondent filed a motion for leave to file an amended answer out of time. It was granted by the Court on May 4, 2010. Respondent recharacterized the unreported income from the corporation as petitioners' income and not as qualified dividends. He also increased the determined deficiency for 2005 by $122,799 to $416,867 with a corresponding $24,559.80 increase of the section 6662(a) penalty to $83,373.40. A trial was held on June 18, 2010, in Los Angeles, California.

OPINION

I.  Burden of Proof

Section 61(a) specifies that "Except as otherwise provided" gross income includes "all income from whatever source derived". The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the

determination is improper.  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

The Court of Appeals for the Ninth Circuit, to which an appeal would lie absent a stipulation to the contrary, has held that in unreported income cases, the presumption of correctness applies only after the Commissioner introduces some substantive evidence that the taxpayer received unreported income.  <u>Edwards v. Commissioner</u>, 680 F.2d 1268, 1270 (9th Cir. 1982); <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358, 360-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977).  If the Commissioner introduces such evidence, the burden shifts to the taxpayer to show by a preponderance of the evidence that the deficiency was arbitrary or erroneous.  See <u>Hardy v. Commissioner</u>, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97.

By introducing the banking information of Media Fox and Global Glen, which establishes that only Mr. Akopian could draw on the corporate accounts, that the accounts were used to provide cash and to pay personal expenses, and that amounts were given directly to Mr. Akopian, respondent has introduced sufficient evidence connecting petitioners with the unreported income. Consequently, respondent's determination is entitled to the presumption of correctness.

## II.  Recordkeeping Requirements

Taxpayers must maintain adequate records to substantiate their income and deductions.  Sec. 6001 (the taxpayer "shall keep such records"); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  As in this case, when the taxpayers fail to maintain adequate books and records, the Commissioner is authorized to use whatever method he deems appropriate to determine the existence and amount of the taxpayers' income so long as, in the Commissioner's reasonable opinion, the method clearly reflects income.  Sec. 446(b); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148 (5th Cir. 1983); Gowni v. Commissioner, T.C. Memo. 2004-154.  The Commissioner has wide discretion in determining which method to apply, and reconstruction of the taxpayers' income "need only be reasonable in light of all surrounding facts and circumstances."  Gowni v. Commissioner, supra.

## III. Unreported Income

By examining the banking activities of Media Fox and Global Glen, respondent determined on the basis of withdrawals, ATM purchases, payments made to BMW, and checks written from the corporations that petitioners had unreported income.  In respondent's view, because Mr. Akopian has failed to show appropriate financial operation of the corporations and had unrestricted control over all of these distributions, under the

claim of right doctrine petitioners must include all of the amounts in gross income.[7]  N. Am. Oil Consol. Co. v. Burnet, 286 U.S. 417 (1932).

   A.   Withdrawals, Checks Written to Mr. Akopian, and Cash

According to the bank statements of both Media Fox and Global Glen in 2005 and 2006 there was a total of $906,040 withdrawn at the bank by Mr. Akopian.  As shown in table 2 above, in 2005 and 2006 checks totaling $410,240 were written to Mr. Akopian and checks totaling $259,428 were written to cash from the Media Fox and Global Glen bank accounts.  As Mr. Akopian was the sole signatory on the bank accounts, only he could make the withdrawals and sign the checks.

According to Mr. Akopian, the Armenian company wanted cash because it would make producing the movie less expensive and because Armenian banks could not provide proper banking.  To provide the cash, Mr. Akopian said that he would draw cash or cashier's checks in his name from Media Fox and then have a transferring service wire the money to Armenia and/or Russia.  Also, according to Mr. Akopian's and Mr. Bagdasarian's testimony, as with Media Fox, Global Glen sent money to the Armenian company

---

[7]Under the claim of right doctrine a taxpayer must include in income any amounts that the taxpayer has unrestricted control over the use or disposition of and treats as his own.  N. Am. Oil Consol. Co. v. Burnet, 286 U.S. 417 (1932).

by drawing either cash or cashier's checks in Mr. Akopian's name from the Global Glen bank account.

Petitioners claim that the withdrawals and the checks written to Mr. Akopian and to cash were used to transfer money from the corporations to the Armenian company. Petitioners argue that Mr. Akopian was a mere conduit for the money and thus "need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else". Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974).

We cannot find that there is sufficient credible evidence corroborating Mr. Akopian's and Mr. Bagdasarian's testimony that the amounts should not be includable in petitioners' income. Although both Mr. Akopian and Mr. Bagdasarian testified that Media Fox and then Global Glen would wire the Armenian company cash, there is not one shred of documentary evidence corroborating those statements. Overall their testimony was inconsistent, fanciful, and not credible.

Mr. Akopian testified that all of the corporations' documents disappeared along with Mr. Gevorgian.[8] However, had

---

[8]We are extremely skeptical that Mr. Gevorgian conveniently disappeared with all of the documents. According to Mr. Akopian he was a longtime acquaintance whom Mr. Akopian trusted enough to form a company for and to invest over a million dollars in his idea.

(continued...)

petitioners simply presented their own bank documents (which, if they exist, petitioners might have easily acquired), they could have shown that the money was not deposited into their accounts and circumstantially shown that it was not used for personal expenses.  Petitioners' failure to introduce evidence "which, if true, would be favorable to [them], gives rise to the presumption that if produced it would be unfavorable".  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

The bank documents themselves are further evidence that this money was not transferred to the Armenian movie company.  Media Fox's bank statements show that towards the end of both 2005 and 2006, significant amounts of money were wired to foreign entities.  The fact that the corporation was directly wiring money to a foreign entity tends to discredit claims that Mr. Akopian was required to write himself a check or write a check for cash in order to transfer the money to Armenia.

Except for the self-serving testimony of Mr. Akopian and Mr. Bagdasarian, there is absolutely no evidence concerning Media Fox

---

[8](...continued)
Also, this testimony is inconsistent with the examining agent's written record of the initial interview with Mr. Akopian's attorney admitted by stipulation in this case.  On July 3, 2008, during an initial interview with the examining agent, when asked why Mr. Akopian did not have copies of the bank records, Mr. Akopian's attorney stated that Mr. Akopian "did not know what he was doing.  So he basically threw away everything when it came in."

or Global Glen, no contracts, invoices, minutes, spreadsheets, or even an old email discussing the business purpose of the corporations.  There is also no evidence of the existence of the Armenian company or even a movie being made.  Nothing.  Therefore we find that Mr. Akopian received the amounts under a claim of right and must include those amounts in gross income.  See <u>Ludwig</u> <u>v. Commissioner</u>, T.C. Memo. 1983-678, affd. without published opinion 779 F.2d 51 (6th Cir. 1985).

B.   <u>ATM Card Use, BMW Payments, Checks Written to Ms.</u>
     <u>Terfanyan and Ruz Meg and for Personal Expenses</u>

Petitioners advance two theories as to why the amounts received from Media Fox and Global Glen for personal expenses in 2005 and 2006 were not income.  First, petitioners argue that Mr. Akopian took out a line of credit against petitioners' condo of $100,000 and injected $50,000 of it into the business and that the check written to Ms. Terfanyan were repayments of that line of credit.  Second, petitioners argue that the corporate funds used to pay petitioners' personal expenses were loans.

Other than petitioners' own self-serving testimony, there is simply no evidence that a line of credit was ever taken out against petitioners' home.  Although allegedly all of the corporate documents disappeared along with Mr. Gevorgian, a copy of the loan documentation could have been obtained from the bank or other lender issuing the line of credit.  Petitioners' failure to introduce this evidence, which would have been in their favor,

again gives rise to the presumption that it would have been unfavorable. See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, <u>supra</u> at 1165. In the absence of loan and payment documents and records, we do not find that the use of corporate funds for petitioners' personal expenses constituted a repayment of a line of credit.

We are also unpersuaded by petitioners' vague self-serving testimony that the amounts were loans from the corporations which Mr. Akopian was expected to repay. See <u>Page v. Commissioner</u>, 58 F.3d 1342, 1346 (8th Cir. 1995), affg. T.C. Memo. 1993-398; <u>Schneebalg v. Commissioner</u>, T.C. Memo. 1988-563. Mr. Bagdasarian explained that Mr. Akopian was allowed to spend the corporations' money and that it was "regarded as a loan". He explained that there was no formal agreement for the loan because they "always did things verbally, and * * * trusted each other."

Even more egregious than the fact that there is no documentation of the loan, there is no evidence that Mr. Akopian was even keeping track of the amounts of the corporations' money that he used for personal expenses. Mr. Akopian treated the corporations as his personal piggy bank. He used corporate money to make mortgage payments, pay his HOA dues, buy clothing, and even pay for his child's daycare. We do not find that the use of the corporate money for personal expenses was a loan.[9]

---

[9]We further note, ignoring possible timing differences, that
(continued...)

Therefore petitioners must include in income all of the amounts at issue discussed above.

IV. Section 6662(a) Penalties

Respondent determined that petitioners are liable for section 6662(a) accuracy-related penalties for their 2005 and 2006 tax years. Pursuant to section 7491(c), the Commissioner has the burden of production with respect to a taxpayer's liability for a penalty and is, therefore, required to "come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, "once the Commissioner meets his burden of production, the taxpayer must come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." Id. at 447.

Subsection (a) of section 6662 imposes an accuracy-related penalty of 20 percent of any underpayment attributable to causes specified in subsection (b). Respondent asserts two causes justifying the penalty: A substantial understatement of income tax, subsec. (b)(2), and negligence, subsec. (b)(1).

---

[9](...continued)
the discharge of indebtedness is a source of income. Sec. 61(a)(12). Mr. Bagdasarian explained that because the corporation never succeeded, "there was no money, and there was no income for Khatchatour to be able to repay the corporation." Where, as here, the taxpayer is not required to repay the "loan", the proceeds are income to the taxpayer in the year of the "loan". See United States v. Kirby Lumber Co., 284 U.S. 1, 2 (1931).

There is a "substantial understatement" of income tax for any tax year where the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the tax year or in the case of an individual (2) $5,000. Sec. 6662(d)(1)(A). "[N]egligence" is "any failure to make a reasonable attempt to comply with the provisions of this title" (i.e., the Internal Revenue Code). Sec. 6662(c). Under caselaw, "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate: (1) Reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances". Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent met his burden of production under both causes, and petitioners did not address the section 6662(a) penalties at

trial.  Petitioners presented no evidence that they had reasonable cause for any portion of any underpayment.  See Basile v. Commissioner, T.C. Memo. 2005-51 ("Because petitioners did not contest the additions to tax or penalties in the petitions, they are deemed conceded." (citing Rule 34(b)(4) and Swain v. Commissioner, 118 T.C. 358, 364-365 (2002))).  Petitioners, while contesting the income tax liabilities on which the penalties are based, have never specifically pleaded that there was reasonable cause for any negligence or substantial understatement of income tax.  Petitioners are liable for the penalties.

V.   Section 6015 Relief

In general, married taxpayers may elect to file a joint income tax return.  Sec. 6013(a).  After making the election, each spouse is jointly and severally liable for the entire Federal income tax liability for that year, whether as reported on the joint income tax return or subsequently determined to be due.  Sec. 6013(d)(3); see sec. 1.6013-4(b), Income Tax Regs.  A spouse or former spouse may petition the Commissioner for relief from joint and several liability in certain circumstances.  See sec. 6015(a).  Ms. Terfanyan asserts that she is entitled to relief under either section 6015(b) or (f).  The Court's scope and standard of review are de novo.  Porter v. Commissioner, 132 T.C. 203, 210 (2009).

A.    Relief Under Section 6015(b)

Section 6015(b) provides:

    SEC. 6015(b).  Procedures for Relief From
Liability Applicable to All Joint Filers.--

        (1) In general.--Under procedures prescribed
    by the Secretary, if--

            (A) a joint return has been made for a
        taxable year;

            (B) on such return there is an
        understatement of tax attributable to
        erroneous items of 1 individual filing the
        joint return;

            (C) the other individual filing the
        joint return establishes that in signing the
        return he or she did not know, and had no
        reason to know, that there was such
        understatement;

            (D) taking into account all the facts
        and circumstances, it is inequitable to hold
        the other individual liable for the
        deficiency in tax for such taxable year
        attributable to such understatement; and

            (E) the other individual elects (in such
        form as the Secretary may prescribe) the
        benefits of this subsection not later than
        the date which is 2 years after the date the
        Secretary has begun collection activities
        with respect to the individual making the
        election,

    then the other individual shall be relieved of
    liability for tax (including interest, penalties,
    and other amounts) for such taxable year to the
    extent such liability is attributable to such
    understatement.

    "The requirements of section 6015(b)(1) are stated in the

conjunctive.  Accordingly, a failure to meet any one of them

prevents a requesting spouse from qualifying for relief". Alt v. Commissioner, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004). There is no dispute that Ms. Terfanyan satisfies subparagraphs (A), (B), and (E) of section 6015 (b)(1). Nor is there any doubt that Ms. Terfanyan does not satisfy subparagraph (C). Under this requirement, the individual seeking relief under section 6015(b) must establish "that in signing the return he or she did not know, and had no reason to know" that there was an understatement attributable to the erroneous items of the other spouse. Sec. 6015(b)(1)(C); Cheshire v. Commissioner, 115 T.C. 183, 192-193 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Ms. Terfanyan knew that Mr. Akopian had an ownership interest in Media Fox during 2005 and an ownership interest in Global Glen in 2005 and 2006. She also knew that Mr. Akopian was "taking care of some of the expenses" with corporate money. In fact Ms. Terfanyan received checks from the company in her own right and to her own company, Ruz Meg. She also prepared the tax returns at issue relying, if on anything, only on her husband's oral claims he had no income, a fact that with her tax experience she should have known to be untrue. Consequently, Ms. Terfanyan is ineligible for relief under section 6015(b)(1).

B.    Relief Under Section 6015(f)(1)

The Commissioner may relieve a spouse or former spouse from joint and several liability if, taking into account all the facts and circumstances, it would be inequitable to hold the taxpayer liable for any unpaid tax or deficiency.  Sec. 6015(f)(1).  The Commissioner has outlined procedures for determining whether a requesting spouse qualifies for equitable relief under section 6015(f).  See Rev. Proc. 2003-61, 2003-2 C.B. 296.  We now analyze the facts under these procedures to determine whether Ms. Terfanyan qualifies for equitable relief.

1.    Threshold Conditions

Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298, sets forth seven threshold conditions that must be satisfied before the Commissioner will consider a request for equitable relief under section 6015(f), as follows:  (i) The requesting spouse filed a joint income tax return for the taxable year for which he or she seeks relief; (ii) relief is not available to the requesting spouse under section 6015(b) or (c); (iii) the requesting spouse applies for relief no later than 2 years after the date of the Commissioner's first collection activity; (iv) no assets were transferred between the spouses as part of a fraudulent scheme by the spouses; (v) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (vi) the requesting spouse did not file or fail to file the

return with fraudulent intent; and (vii) the Federal income tax liability from which the requesting spouse seeks relief is attributable to an item of the individual with whom the requesting spouse filed the joint income tax return.  Respondent concedes that Ms. Terfanyan satisfies the seven threshold conditions.

## 2. Safe Harbor Conditions

If the threshold conditions are met, the Commissioner ordinarily will grant equitable relief under section 6015(f) with respect to an underpayment of income tax reported on a joint Federal income tax return, provided the following three safe harbor conditions are satisfied:  (i) On the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse; (ii) on the date the requesting spouse signed the joint income tax return, the requesting spouse did not know, and had no reason to know, that the nonrequesting spouse would not pay the tax liability; and (iii) the requesting spouse will suffer economic hardship if the Commissioner does not grant relief.  Id. sec. 4.02, 2003-2 C.B. at 298.

Ms. Terfanyan is still married to and lives with Mr. Akopian.  Therefore she does not satisfy the first condition. Accordingly, because Ms. Terfanyan does not meet all the

requirements of the safe harbor, she does not qualify for relief under Rev. Proc. 2003-61, sec. 4.02.

### 3. Facts and Circumstances Test

A requesting spouse, such as Ms. Terfanyan, who satisfies the threshold conditions but fails to satisfy the safe harbor conditions under Rev. Proc. 2003-61, sec. 4.02, is nevertheless eligible for relief under section 6015(f) if, taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable for an underpayment. Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298-299, lists various nonexclusive factors to be considered in deciding whether to grant equitable relief under section 6015(f). No single factor is determinative, all factors are to considered and weighed appropriately, and the list of factors is not intended to be exhaustive. Id. Our analysis of the relevant factors and circumstances is as follows.

### a. Marital Status

Ms. Terfanyan is still married to and lives with Mr. Akopian. This factor weighs against relief.

### b. Economic Hardship If Relief Were Denied

The second factor under Rev. Proc. 2003-61, sec. 4.03, is whether the requesting spouse will suffer economic hardship if relief is not granted. Economic hardship for these purposes is defined as the inability to pay reasonable basic living expenses

if the requesting spouse is held liable for the tax owed.  See sec. 301.6343-1(b)(4), Proced. & Admin. Regs.  The ability to pay reasonable basic living expenses is determined by considering among other things the following nonexclusive factors:  The taxpayer's age; employment status; ability to earn; number of dependents; and expenses for food, clothing, housing, medical, and transportation; and any extraordinary circumstances.  Id.

Ms. Terfanyan computed her monthly household income as $7,450 and her monthly household expenses as $7,949.  She is still living with her husband and thus these numbers presumably include his income and expenses as well.  Ms. Terfanyan is therefore demonstrating that the tax deficiency will make a hardship on her household whether or not she is granted relief from joint liability.  Accordingly, this factor favors Ms. Terfanyan.

### c. Knowledge or Reason To Know That the Nonrequesting Spouse Would Not Pay the Income Tax Liability

Ms. Terfanyan knew that Mr. Akopian was using corporate money to pay their personal expenses.  She must have known that petitioners did not have the money to pay all of their expenses. Even her innocent spouse relief application shows that her household's expenses exceed their income.  Therefore, Ms. Terfanyan knew that Mr. Akopian could not pay the tax liabilities. This factor weighs against granting relief.

d.  Nonrequesting Spouse's Legal Obligation To
    Pay the Outstanding Liability

Because Ms. Terfanyan and Mr. Akopian remained married, this factor is neutral.

e.  Significant Economic Benefit

A fifth factor is whether the requesting party received a significant economic benefit from the unpaid income tax liability in excess of normal support.  Mr. Akopian used corporate money to pay petitioners' personal expenses.  Petitioners certainly received an economic benefit from the unreported income.  To the extent that it would have been less because of tax, petitioners received a significant economic benefit from the unpaid income tax.  This factor weighs against granting relief.

f.  Subsequent Compliance With Income Tax Laws

A sixth factor is whether the requesting spouse made a good faith effort to comply with Federal income tax laws in subsequent years.  Because of the lack of evidence this factor is neutral.

g.  Abuse

A seventh factor is abuse of the requesting spouse.  The record does not indicate Ms. Terfanyan suffered abuse; thus this factor is neutral.

h.  Poor Health When Signing the Return or
    Requesting Relief

The final factor is whether the requesting spouse was in poor health when signing the return or requesting relief.  The

record does not indicate that Ms. Terfanyan was in poor health when she signed the 2005 and 2006 joint income tax returns. Therefore, this factor is neutral.

C. Conclusion About Equitable Relief

After weighing the testimony and other evidence, we conclude that Ms. Terfanyan is not entitled to equitable relief for either year. Ms. Terfanyan is knowledgeable about tax law and tax return preparation. She prepared the tax returns at issue here knowing they did not report all of petitioners' income and that the true and correct tax owed was very unlikely to be paid, at least voluntarily. Accordingly, the Court finds that Ms. Terfanyan is not entitled to any "equitable" relief under section 6015(f).

VI. Conclusion

Petitioners are liable for the deficiencies in income tax and the section 6662(c) penalties for 2005 and 2006. Ms. Terfanyan is not entitled to relief from joint liability under section 6015.

The Court has considered all of petitioner's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.